**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF WASHINGTON**

**TACOMA DIVISION**

Jeffry LeBret, on behalf of himself and a class
of similarly situated individuals

          Plaintiffs,

       vs.

LLOYD J. AUSTIN, III
Secretary of Defense
1000 Defense Pentagon
Washington D.C., 203500-0001
(in both his individual and official capacity),

VICE ADMIRAL
GILBERT R. CISNEROS, JR.
Department of Defense
Under Secretary of Defense for Personnel and
Readiness

Case No.:

PLAINTIFFS'

CLASS COMPLAINT

JURY DEMAND

4000 Defense Pentagon

Washington D.C. 20301-4000

(in both his individual and official capacity),


THE DEPARTMENT OF DEFENSE

1000 Defense Pentagon

Washington D.C., 203500-0001

COMMANDER CARLOS DEL TORO

Secretary of the Navy

United States Navy

1200 Navy Pentagon

Washington D.C., 20530-1200

(in both his individual and official capacity),


THE UNITED STATES NAVY

1000 Navy Pentagon

Washington, D.C., 20350-1200


VICE ADMIRAL WILLIAM J. GALINIS

United States Navy

Commander, Naval Sea

Systems Command

1333 Isaac Hull Avenue, SE

Washington Navy Yard, DC 20376

(in both his individual and official capacity),


NAVAL SEA COMMAND SYSTEMS

1333 Isaac Hull Avenue, SE

Lloyd, Lemmon, & Hale, PLLC
15 Chester St.
Front Royal, VA 22630
(540)823-1110

Washington Navy Yard, DC 20376

Defendants.

## CLASS COMPLAINT

Plaintiff and Putative Class Agent ("PCA") Jeffry Lebret, by counsel, on behalf of himself and a class of similarly situated individuals, (together "Plaintiffs" or "Putative Class Members") states the following in support of their Class Complaint and Jury Demand against Lloyd J. Austin III, *et al.*, ("Defendants" or "the Department"):

## INTRODUCTION

1)    The United States Navy's mission is to "train and equip combat-ready naval forces capable of winning wars, deterring aggression and maintaining freedom of the seas."

2)    Part of its mission statement states clearly: "[W]e defend freedom [and] preserve economic prosperity."

3)    To defend freedom for all, including its active duty and civilian workforce, the Navy proudly appointed a Deputy Inspector General for Diversity and Inclusion and Insider Threats.[1]

4)    However, when it comes to the treatment Plaintiffs, a class of religious believers holding unpopular religious views, Navy leadership failed in these efforts to become more diverse and inclusive and has failed to adhere to its overall mission to defend freedom and

---

[1] Biography of Theresa S. Hull, Deputy Inspector General for Diversity and Inclusion and Extremism in the Military, Department of Defense Office of Inspector General, at https://www.dodig.mil/Biographies/Bio-Display/Article/2789715/theresa-s-hull/. Vice Admiral Gilbert Cisneros himself is the Chief Diversity and Inclusion officer for the Department of Defense.

prosperity. In in doing so, it violated Plaintiff's religious liberty and the laws of the United States.

5) As described in more detail below, the Department of Defense, including Department of the Navy, and the Naval Sea Command Systems ("NAVSEA"), forced Plaintiffs to defend their beliefs in the face of a mandate that created a culture of persecution and contempt for Plaintiffs who were simply trying to live according to their faith.

6) In doing so, the Defendants harassed, shamed, "outed," segregated, ostracized, and excluded religious believers who objected to the vaccine mandate.

7) After being told by the most senior leader of NAVSEA, "Frankly, if you are not vaccinated, you will not work for the U.S. Navy," Plaintiffs, who had sincere religious beliefs against using the vaccine, heard loud and clear their jobs were in jeopardy, their careers were at risk, and their livelihoods were at stake as a result of their religious beliefs.

8) While they tried to follow procedure by filing a religious accommodation to the vaccine, their accommodation requests languished in some unknown abyss, for over a year and a half while they suffered harassment to accept the vaccine over and above their religious objections.

9) Even while their accommodation requests were pending, the Defendants stripped Plaintiffs of their ability to come to work and to travel for important assignments required by their jobs, placed them on unpaid leave or on AWOL, threatened them with termination, and forced some out of their jobs because of the intolerable working environment they created and fostered.

10) Despite years of dedicated public service, Defendants discriminated against Plaintiffs not because Plaintiffs failed in executing their duties, and not because Defendants

Lloyd, Lemmon, & Hale, PLLC
15 Chester St.
Front Royal, VA 22630
(540)823-1110

found they presented an actual risk to others. Defendants took such actions because Plaintiffs held sincere religious beliefs that were legitimately opposed to the COVID-19 vaccine, and those beliefs did not fit in a culture that embraced it. Indeed, Defendants valued forcing others to "embrace" the vaccine over many other cherished values such as religious liberty, mutual respect, bodily autonomy, and human dignity.

11) This was part of an intentional effort to "render being unvaccinated so burdensome that those who haven't received shots will have little choice other than to get them," despite their constitution, statutory (and God-given) right to religious freedom.[2]

12) Plaintiffs, whose mission it is to defend freedom, bring this suit to remedy the harms they suffered at the hands of the Defendants, and to bring accountability to those who have failed to uphold this mission.

## JURISDICTION AND VENUE

13) Plaintiffs' claims arise out of Defendants' violation of Title VII (42 U.S.C. § 2000e, *et seq*.) and the Religious Freedom Restoration Act (42 U.S.C. §20000bb *et seq*) ("RFRA").

14) This Court has jurisdiction under 5 U.S.C. §§ 701–706 (Administrative Procedures Act), and 28 U.S.C. §1331 (federal question jurisdiction), §1346 (U.S. as defendant), §1361(action to compel U.S. official to perform his duty), §2201(U.S. as defendant) and 42 U.S.C. § 2000e 5(f)(3) (Civil Rights Act).

15) The Court also has jurisdiction pursuant to Title 28 U.S.C §1332 (diversity of citizenship) and 28 U.S.C. §1343(a)(4) (jurisdiction over Civil Rights claims).

---

[2] Maegan Vasquez, *Biden announces measures to incentivize COVID-19 vaccinations, including a requirement for federal employees*, CNN.com, (July 29, 2021), available at: https://www.cnn.com/2021/07/29/politics/joe-biden-vaccination-requirement-announcement/index.html (last visited, May 6, 2022).

Lloyd, Lemmon, & Hale, PLLC
15 Chester St.
Front Royal, VA 22630
(540)823-1110

16)     Venue is proper under 42 U.S.C. § 2000e 5(f)(3) and 28 U.S.C. § 1391(e)(1)(B) because the United States, one or more of its agencies, and one or more of its officers in his or her official capacity are Defendants; and a substantial part of the events giving rise to PCA LeBret's claims occurred in this District.

## **PARTIES**

17)     Plaintiff and PCA LeBret is a GS-12 Production Acceptance Engineer with the Naval Undersea Warfare Center ("NUWC") Division Keyport, Washington ("Keyport" or "NUWC Keyport"), which is a subordinate command to NAVSEA. Mr. LeBret has been in Federal Service since May of 2002.

18)     All other putative class members are individuals who, like Mr. LeBret, are or were NAVSEA employees and filed religious accommodation requests to be exempt from the vaccine based on sincerely held religious beliefs.[3]

19)     Defendant Lloyd Austin is the Secretary of Defense, which is an agency of the United States Government. Plaintiffs sue him in his individual capacity, and only in his individual capacity, with respect to their Religious Freedom Restoration Act claims.

20)     Defendant Gilbert Cisneros Jr. is Under Secretary of Defense. He was sworn in on August 2021 as the Under Secretary of Personnel and Readiness and is currently the Chief Diversity and Inclusion Officer for the Department of Defense. Plaintiffs sue him in his individual capacity, and only in his individual capacity, with respect to their Religious Freedom Restoration Act claims.

---

[3] Mr. LeBret has personal knowledge of up over 100 putative class members and will provide affidavits from some or all of those individuals upon his motion for class certification. Upon information and belief, there are likely many other similarly situated but unknown putative class members who may be eligible to join the class.

21)     Defendant Department of Defense ("DoD") provides the military forces needed to deter war, and to protect the security of the United States.

22)     Defendant Carlos Del Toro is the Secretary of the Navy for the United States and oversees the operations of the Department of the Navy, which include the COVID-19 vaccination, testing, and masking policies at issue here. All plaintiffs are members of the Department that he oversees. Plaintiffs sue him in his individual capacity, and only in his individual capacity, with respect to their Religious Freedom Restoration Act claims.

23)     Defendant U.S. Navy is a branch of the United States Military in charge of warfare at sea. The Navy implemented the COVID-19 policies as directed by DoD and rolled them out to NAVSEA.

24)     Defendant Vice Admiral William Galinis is the Commander of NAVSEA. Plaintiffs sue him in his individual capacity, and only in his individual capacity, with respect to their Religious Freedom Restoration Act claims. Plaintiffs sue him in his official capacity, and only his official capacity, for all other claims.

25)     Defendant Naval Sea Systems Command ("NAVSEA") employs approximately 86,800 civilians and active-duty military. Its purpose is to "design, build, deliver and maintain ships, submarines and systems reliably, on-time and on-cost for the United States Navy." Mr. LeBret and all other putative class members work or worked for NAVSEA during the period during which the events described herein occurred.

## STATEMENT OF FACTS

### VACCINE MANDATE

Lloyd, Lemmon, & Hale, PLLC
15 Chester St.
Front Royal, VA 22630
(540)823-1110

26)     Health authorities declared that COVID-19 had reached pandemic status in March of 2020.

27)     On January 20, 2021, President Biden issued EO 13991, which established a Safer Federal Workforce Task Force (the "Task Force") and charged it with "provid[ing] ongoing guidance to heads of agencies on the operation of the Federal Government, the safety of its employees, and the continuity of Government functions during the COVID-19 pandemic." 86 Fed. Reg. 7045, 7046.

28)     On September 9, 2021, the President issued Executive Order ("EO") 14043, which required all federal employees to be vaccinated with on of the three vaccines available for COVID-19[4], subject to "such exceptions as required by law." 86 Fed. Reg. 50989. The order tasked every federal agency with implementing the EO. *Id.* at 50990. The Agencies were to receive "implementation" guidance from the Task Force, which would issue guidance within seven days. *Id.*

29)     Simultaneously, the President stated that while "fully vaccinated" individuals are "highly protected from sever illness even if [they] get COVID-19," and being fully vaccinated renders these individuals "as safe as possible," he was nonetheless issuing vaccine mandates "to protect vaccinated workers from unvaccinated co-workers." Katie Rogers and Cheryl Gay Stolberg, *Biden Mandates Vaccines for Workers, Saying, 'Our Patience is Wearing Thin,'* NEW

---

[4] *See, e.g.*, Fred Guterl, *COVID-19 Vaccines and Fetal Tissue: The Science and Controversy Explained*, NEWSWEEK, March 21, 2021, at https://www.newsweek.com/covid-19-vaccines-fetal-tissue-science-controversy-explained-1575863. ("Fetal-cell lines played a vital role in the development of all three vaccines. Moderna and Pfizer used Van der Eb's original cell line, called HEK 293, in the testing of their coronavirus vaccines—that is, scientists first developed the vaccines using their mRNA technologies and subsequently tested them on lab-cultured HEK 293 cells, ancestors of the original cells that Van der Eb took from an embryo almost 50 years ago. Johnson & Johnson used a different fetal-cell line, called PER.C6, that was cultured in Van der Eb's lab in 1995. While Moderna and Pfizer used fetal cells for testing their vaccine after it was already produced, J&J used fetal cells as tiny "factories" that produced the active ingredient in its vaccine.")

Lloyd, Lemmon, & Hale, PLLC
15 Chester St.
Front Royal, VA 22630
(540)823-1110

YORK TIMES, (September 9, 2021, updated November 12, 2021) at

https://www.nytimes.com/2021/09/09/us/politics/biden-mandates-vaccines.html.

30)     Yet as early as August 2021, it was public knowledge that while the vaccine did "not prevent transmission" of the disease, particularly as it related to the Delta variant, which comprised 93% of all cases at the time. Holcombe and Maxouris, *CDC head says COVID-19 vaccines prevent severe illness and death, but they can't prevent transmission*, CNN.COM, (August 16, 2021), at https://www.cnn.com/us/live-news/coronavirus-pandemic-vaccine-updates-08-06-21/h_61de1502e86060f5faf4477339928e33. *See also*, Singanayagam, Ankia, PhD, et al., *Community transmission and viral load kinetics of the SARS-CoV-2 delta (B.1.617.2) variant in vaccinated and unvaccinated individuals in the UK: a prospective, longitudinal, cohort study,* The Lancet, Infectious Diseases, October 29, 2021, https://www.thelancet.com/journals/laninf/article/PIIS1473-3099(21)00648-4/fulltext (British study finding that "fully vaccinated individuals with breakthrough infections have peak viral load similar to unvaccinated cases and can efficiently transmit infection in household settings, including to fully vaccinated contacts").

31)     Even before President Biden's vaccine mandate on September 9, 2021, Under Secretary of Defense Cisneros issued a memorandum to DoD leadership announcing guidelines for DoD civilian personnel in responding to Covid-19. Memorandum from Office of the Under Secretary of Defense to Chief Management Officer of the Department of Defense, *et al.*, *Civilian Personnel Guidance for DoD Components in Responding to Coronavirus Disease 2019*, March 8, 2020.

32)     This document outlined, among other things, early guidelines for leaders of DoD civilian employees to follow during the pandemic. *Id.* It covered topics such as teleworking,

alternative work schedules, use of various types of leave due to illness, and guidance on safety and hygiene best practices. This memo applied to all DoD civilian employees and established that the Department was the policymaker and enforcer for all things COVID-19 as it applied to its civilian employees.

33) On August 24, 2021, the Secretary of Defense issued a memorandum directing the mandatory vaccination of Service members against COVID-19.

34) In it, he stated, "After careful consultation with medical experts and military leadership, and with the support of the President, I have determined that mandatory vaccination against coronavirus disease 2019 (COVID-19) is necessary to protect the Force and defend the American people."

35) President Biden issued EO 14043 two weeks later on September 9, 2021.

36) The Deputy Secretary of Defense issued a memorandum officially rolling out President Biden's vaccine mandate to leadership of all civilian employees on October 1, 2021.

37) In that memorandum, Deputy Secretary of Defense Hicks noted that, "All DoD civilian employees must be fully vaccinated by November 22, 2021, subject to exemptions as required by law."

38) She further noted that "[a]dditional guidance, including procedures for processing vaccination exemption requests, will be published by the Under Secretary of Defense for Personnel and Readiness ("USD (P&R)"). The USD (P&R) is authorized to rescind this memorandum as necessary for purposes of providing updated guidance."

39) Deputy Secretary of Defense Hicks's order was published to all civilian employees on October 4, 2021.

Lloyd, Lemmon, & Hale, PLLC
15 Chester St.
Front Royal, VA 22630
(540)823-1110

40) The guidance further required that employees attest to their vaccination status. ("Employees, including those who have already received COVID-19 vaccines, must be prepared to provide a copy of their COVID-19 vaccine record in order to meet forthcoming procedures for DoD COVID-19 vaccination verification.").

41) Per Deputy Secretary of Defense Hick's order, Under Secretary of Defense for Personnel and Readiness (Cisneros) published additional, more comprehensive guidance on October 18, 2021, which set forth the detailed policies that Plaintiffs would be subject to, including policies that would NOT apply to certain DoD employees and contractors.

42) The Guidance, which included eight policy attachments, outlined DoD's policies regarding its vaccine and attestation requirements; testing, masking, and distancing protocols; enforcement mechanisms; and requests for religious and medical exemptions.[5]

43) DoD made it clear that it meant business. It established enforcement provisions for civilian employees who "refuse to be vaccinated, or to provide proof of vaccination," that included "counseling and education," suspension and potential removal from Federal service.

44) The Guidance stated:

DoD civilian employees who refuse to be vaccinated, or to provide proof of vaccination, are subject to disciplinary measures, up to and including removal from Federal service, unless the DoD civilian employee has received an exemption or the DoD civilian employee's timely request for an exemption is pending a decision . . .

Progressive enforcement actions include, but are not limited, to
• A 5-day period of counseling and education;

---

[5] The FHG policy had been and continued to be updated until it was consolidated with other policy memoranda into a single policy document. "The Department began publishing FHP guidance and policy to address COVID-19 in January 2020. In February 2021, the Secretary of Defense directed the review of all guidance and policy memoranda previously issued for COVID-19. The review was completed in April 2021, and subsequent updates align DoD COVID-19 policy and guidance with current Task Force, OMB, CDC, and OSHA guidance as appropriate." See, Memorandum from Under Secretary of Defense to Senior Leadership, et al., *Consolidated Department of Defense Coronavirus Disease, Force Health Protection Guidance*, April 4, 2022.

- A short suspension without pay, of 14 days or less, with an appropriate notice period. Senior Executive Service members may only be suspended for more than 14 days;
- Removal from Federal service for failing to follow a direct order.[6]

45)     The Guidance further stated that "Exemptions will be granted *in limited circumstances only where legally required*," and that more guidance would be coming. Under Secretary Cisneros directed leaders at that time to "take no action on any exemption requests received from DoD civilian employees.[7]

46)     The Guidance also made clear that employees with religious objections to the vaccine would be required to undergo frequent and burdensome testing, masking, and distancing protocols, which in many cases, also violated Plaintiffs' religious beliefs.[8]

47)     Related guidance also prohibited religious believers from work-related travel unless the assignment was "mission-critical."

48)     This meant they were not allowed to travel for learning and development opportunities, leadership training, participation in "out to sea" opportunities, temporary duty assignments (which were coveted travel positions with extra pay) and were removed from projects because of restriction on travel.

49)     Many were not even permitted to be at work in person or with the fleet at sea or while in port.

---

[6]  Memorandum from Under Secretary of Defense to Senior Pentagon Leadership et al., *Force Health Protection Guidance (Supplement 23) Revision 1- Department of Defense Guidance for Coronavirus Disease 2019 Vaccination Attestation, Screening Testing, and Vaccination Verification*, October 18, 2021 ("Force Health Protection Guidance Rev. 1" or "FHP Guidance Rev 1").
[7]  *Id*. Attachment 1, Vaccination Requirements for DoD Civilian Employees, ¶4, Exemptions to DoD Civilian Employee COVID-19 Vaccination Requirement.
[8] *Id*. Attachment 5, COVID-19 Screening Testing Requirements.

Lloyd, Lemmon, & Hale, PLLC
15 Chester St.
Front Royal, VA 22630
(540)823-1110

50)     Yet employees who did not share Plaintiffs' religious objections were also known carriers and transmitters of COVID-19, yet were not required engage in testing and related restrictions.

51)     The memorandum from Cisneros set the stage for NAVSEA to create and nurture a culture of discriminatory conduct, harassment and what appeared to be intentional humiliation of religious believers who objected to the vaccine mandate to coerce their compliance.

52)     When Mr. LeBret and putative class members received the DoD memo, they knew immediately that the vaccine was anything but voluntary.

53)     They had three choices: (1) submit to being injected with a vaccine that had been developed at "Warp Speed," employed medical technology never tried on humans, and had only received emergency approval, (2) apply for *and* be granted a "legally mandated exception," or (3) lose their jobs.

<u>PRESSURE AND COERCION BEGINS</u>

54)     The coercion began in earnest when, on October 14, 2021, Vice Admiral Galinis sent an email to all NAVSEA employees, directed specifically "toward those of you who are eligible but have not yet made the decision to get vaccinated."

55)     Galinis sent the email to "share a few words of encouragement," as he discussed his belief that "the vaccination if the best tool we have to prevent widespread COVID manifestations throughout our Force."

56)     His email states, "We are moving quickly to a workforce where vaccinations are a condition of employment. *Frankly, if you are not vaccinated, you will not work for the U.S. Navy.* (emphasis added).

57)     Galinis went on to say:

Do if for your co-workers and your shipmates. . . Do it for *your career* and your loved ones. . . Your leadership and *personal decision* to continue to serve. . . is also vital to protecting yourself and your family from hospitalization and death. . . By now you have received a letter from your HR specialists that *outlines your responsibility as a federal employee.* (emphasis added).

58) Galinis thereby made clear that Plaintiffs' careers would suffer and that they would be failing in their responsibility to the Department.

59) This admonition from the senior-most leader of NAVSEA, proclaimed loudly that Galinis did not care about Plaintiffs' deep and abiding religious beliefs.

60) In light of the vast amount of DoD resources dedicated to diversity and inclusion, including frequent trainings, personnel devoted to nothing but, and a Chief Diversity and Inclusion Officer, what Galinis did NOT say in his memo was meaningful. He did not offer a commitment to protecting employees' religious freedoms or an assurance that the Navy would work with them to protect them from government coercion and overreach. He did not even mention the opportunity to apply for a religious exemption until a later communication.

61) Such a blatant dismissal of employees' rights to their religious beliefs was either an unconscionable oversight or an intentional effort to quash their rights in favor of getting the outcome he wanted.

62) Upon information and belief, Galinis and Defendants knew that the mandate would impact religious believers more than any other group.

63) Plaintiffs heard their senior leader's sentiment and soon realized that there was no guarantee of religious liberty.

64) Plaintiffs were fearful and intimidated and knew they were likely facing a choice between their livelihoods and their faith.

EVOLVING ACCOMMODATION PROCESS

65)    In implementing the vaccine mandate, the DOD and the Department of the Navy did not use the religious accommodation process already in place at the time.

66)    In fact, it appears the Navy may not have even had a religious accommodation process in place prior to the pandemic.[9]

67)    In any case, Defendants put a new process in place that was to be used only for religious accommodation requests to the vaccine.

68)    Yet, while Defendants had not issued guidance for reasonable accommodations, it pressured its employees to get the vaccine within a short deadline:

> The deadline for civilian personnel to be fully vaccinated is 22 November 2021. This means that by 8 November 2021 employees must have received their final dose of the vaccine in order to meet the established 22 November 2021 Deadline. *Although the Department of Defense/Department of Navy implementation guidance has not been issued outlining reasonable accommodation and other exemption processes associated with the EO, we are rapidly approaching the vaccination deadline.* We need to ensure our employees are aware of the deadline(s) associated with each vaccine regimen in order to remain compliant with the EO and have been directed to issue the attached Notice of Requirement to all employees.

> Eric Hanson email to Jeff LeBret, at al., October 12, 2021 (emphasis added).

69)    As mentioned above, while DoD was creating a new process for religious accommodations, Department guidance instructed senior leaders that leaders should "take no action on any exemption requests from DOD civilian employees," pending further information.

---

[9] See, *Merlin W., Complainant v. Carlos Del Toro, Secretary of the Navy,* Appeal No. 20220002711, Agency Number 19-4523A-00428 at *10, (Sept. 22, 2021)(pending final publication). In that appeal to the Navy's March 25, 2020, final decision, which arose out of an EEO claim at the PSNS & IMF location in Yokosuka Japan, the EEOC found that the Navy "did not have a process for [plaintiff's religious accommodation] request, which was not connected to a disability." In reversing the Navy's dismissal of Plaintiff's failure to accommodate claim and his claim of retaliatory harassment, the EEOC ordered the Navy to conduct training on religious discrimination and to consider putting a religious accommodation process in place.

Lloyd, Lemmon, & Hale, PLLC
15 Chester St.
Front Royal, VA 22630
(540)823-1110

70)    Adding to the delay and chaos, leaders sent out contradictory information about which form a religious believer should use for making an exception request and to whom he or she should send the form.

71)    For example, on October 22, 2021, Galinis sent out the Navy's "Mandatory Vaccination Plan" to all employees, which gave incorrect information about where to send exception requests.

72)    Galinis's memo instructed employees to send their religious exemption requests to their supervisors, which was incorrect.

73)    DoD officially announced its new process on December 20, 2021, which required its civilian employees to fill out a newly created DD Form 3177 for religious exemptions. DoD announced the purpose of the form and its authority to make determinations about religious accommodations to the vaccine mandate:

> **Principal Purpose**: the information on this form is being collected *so that the DoD may determine whether to grant your request for a religious exemption* to the COVID-19 vaccination requirement for federal employees pursuant to Executive Order 14043 and in furtherance of COVID-19 workplace safety plans. Consistent with the Religious Freedom Restoration Act of 1993, 32 U.S.C., Chapter 21B, and Title VII of the Civil Rights Act, 42 U.S.C. Chapter 21 Subchapter VI, individuals seeking a religious exemption from the vaccine requirement will submit to DoD supporting information about their religious beliefs and practices in order for DoD to evaluate the exemption request.

74)    The new Form DD 3177 form required employees to disclose deeply private and personal information about their religious faith, as well as about other medical conditions, medications, and vaccines they may or may not have taken in the past.

75)    Even this new process for filing a request for a religious exception was not finalized or published before religious accommodation requests were due or the vaccine deadline.

76) Plaintiffs perceived the lack of published policy and the confusion about how to submit documentation attesting to their beliefs to be a strong indication that Defendants were not concerned with protecting their rights or their religious beliefs or worse, Defendants were intent on subverting them.

## PCA LEBRET'S ACCOMMODATION REQUEST

77) PCA LeBret has strong and sincere religious beliefs which he has held for 40 years. As a Christian, the Bible is central to his life and the practice of his faith.

78) He believes that the vaccine mandate conflicts with his religious beliefs for several reasons. First, his faith teaches him that he should not put foreign substances into our bodies, which are temples of God's Holy Spirit:

> 1 Corinthians 6:19-20 and 10:31 reminds us that we are to regard our bodies as temples of God's Holy Spirit and that we are to honor God, the Creator of our very bodies, by not defiling them. I have a sacred trust and responsibility toward my body and this vaccine conflicts with that command (1 Corinthians 3:16-17, Romans 12:1, Philippians 1:20). I firmly believe that the presence of neurotoxins, hazardous substances, attenuated viruses, animal cells, foreign DNA, albumin from human blood, carcinogens, and chemical wastes injected into my body, is in strict violation of our imperative to treat our bodies as Holy temples of the very Spirit of God.

79) Second, he believes that God created his body in an incredible and beautiful way, including designing his immune system to respond to and eliminate threats naturally, the way God designed. He believes God's way is superior to science or any other human method and that to take the vaccine would be untrue to God and his convictions:

> Secondly, the Scriptures reveal that God knows us even before we are conceived and that we are made in His image. Jeremiah 1:4 – 5 "The word of the Lord came to me, saying, 'Before I formed you in the womb I knew you, before you were born I set you apart; I appointed you as a prophet to the nations.'" And God's creative powers are effectively at work while we are yet in the womb. Psalm 139:13 – 16 "For you created my inmost being; you knit me together in my mother's womb. I praise you because I am fearfully and wonderfully made; your works are wonderful, I know that full well. My frame was not hidden from you when I was made in the secret place, when I was woven together in the depths of the earth. Your eyes saw

my unformed body; all the days ordained for me were written in your book before one of them came to be."

Being created by an intelligent designer also dictates that my immune system was created by an all powerful [sic] and all knowing [sic] God. God has designed our human bodies in such an incredible and beautiful way that even with modern medical and scientific discoveries, we comprehend only a fraction of its complexity. One of the wonders of His design is the human immune system, which is capable of identifying and eliminating threats through several lines of defense including innate functions in the skin, mucous membranes, and responses within the body using various enzymes and body cells, as well as the adaptive immune response which targets germs specifically. The vaccination process bypasses much of God's designed immune response and targets only a portion of it. I find the claims that the COVID-19 shot produces superior immunity to the system that God created to be deeply offensive and an act of human arrogance and hubris. It is idolatry to place anything or anyone in a higher position than God. It would be a violation of my convictions and a blasphemous insult to the God that I serve to participate in something that is so widely touted as superior to the system that He designed and created within the human body.

God designed our bodies to have natural immunity from sickness once we get over an illness. On the 27th of September 2021, the Washington State Department of health was notified of my positive test result on my recent COVID-19 test. Having been sick with COVID-19 grants me natural immunity as per God's design and it is my sincerely held religious conviction that this immunity is far superior to anything that has been created by man and does not require me to inject my body with man-made chemicals, therefore compromising these convictions.

80)     Finally, since the Bible teaches abortion is wrong, Mr. LeBret believes it is wrong to take the vaccine which was tested and/or developed using aborted fetal cell lines:

Third, there is a moral duty to refuse the use of medical products, including all vaccines, that are created using human cells lines (fetal cell lines) derived from abortion during any stage of the product's development. I believe man is made in the image of God, and is alive at the moment of conception, so the use of embryonic stem cells in the development or developmental-testing of a vaccine is religiously objectionable (Genesis 1:26-27; 9:6; Psalms 139:13-16; Exodus 21:12-14; Leviticus 24:17; Matthew 26:52).

The COVID-19 vaccines were developed or tested using fetal cell lines that were generated or derived from tissues of aborted fetuses. The Johnson & Johnson vaccine used an aborted fetal cell line in manufacturing its COVID-19 vaccine, while Moderna and Pfizer vaccines used aborted fetal cell lines in testing the efficacy of their vaccines. (Do the COVID-19 vaccines contain aborted fetal cells" Nebraska Medicine, August 4, 2021, https://www.nebraskamed.com/COVID/you-

asked-weanswered-do-the-covid-19-vaccines-contain-aborted-fetal-cells.) So, it is my sincerely held religious belief that, in being vaccinated with any of the currently available COVID-19 vaccines, I would be cooperating with and complicit in abortion – the ending of an innocent human life – and that would constitute a sin against God and a violation of His Commandments, for which I would be held morally accountable by God.

81)     In sum, Mr. LeBret states the following about his religious beliefs conflict with the vaccine and the mandated testing:

The COVID-19 vaccination is in conflict with my religious convictions. These convictions have been a result of my personal study of the Bible and what God has impressed upon me and my family regarding what we are personally to adhere to which is the ultimate reason for my request for a religious exemption and by default a reasonable accommodation.

[My] objection to COVID-19 testing was based on mandating unnecessary medical procedures containing the potential presence of neurotoxins and hazardous substances being introduced into my body, [which] is in strict violation of our imperative to treat our bodies as Holy temples of the very Spirit of God.

## FALURE TO ACCOMMODATE

82)     Because of these beliefs, and to defend his job and his faith as required by the vaccine mandate, Mr. LeBret filed for a religious accommodation to the vaccine on November 7, 2021.

83)     All putative class members similarly filed a request for a religious accommodation to the vaccine. They explained their religious beliefs in detail and how their beliefs conflicted with the vaccine mandate. Of the currently identified putative class members, 95% are Christian and the rest are non-denomination, mono-theistic, and in at least one case, a member of the Satanic Temple.

84)     In a letter attached to the required accommodation form, Mr. LeBret explained that his religious beliefs conflicted not only with the COVID-19 vaccine, but with any vaccine.

As a family, we strive to be good stewards of the bodies that God has given to us. In addition to maintaining a healthy diet and lifestyle, we do not vaccinate our children and do not receive vaccinations ourselves. For the record, I have not received any shots or vaccinations since the time I have been in charge of my own medical decisions. We adopt a proactive approach to family health and a minimalist approach to invasive medicine. We use herbs, oils, vitamins, and food prophylactically and as treatment for any malady we may face. We select medical professionals who are either aligned with our perspectives or will not interfere with the decisions we make based on our convictions. In addition, we strive to avoid any toxic exposure as much as possible in our daily lives, whether in our food or water, the products we put on our bodies, or the very air we breath (ie: we avoid the use of toxic dryer sheets, scented candles, perfumes, etc.). I believe God has better provisions for a healthy life than anything man can create and we simply need to follow the commands set forth in the Bible to achieve robust health. In Him I put my trust.

85)     NAVSEA, the Department of the Navy and DoD all ignored his request.

86)     In fact, the Defendants ignored all putative class members' good-faith religious accommodation requests and did not process them at all.

87)     Defendants never adjudicated any of Plaintiffs' religious accommodation requests.

88)     Mr. LeBret's supervisor did acknowledge receipt of Mr. LeBret's accommodation.

89)     Neither he, nor any DoD employee, ever met with him or spoke to him try to understand more about his request, ask questions, or discuss possible accommodations that would be reasonable to him, however.

90)     Since there was no action on his accommodation request, Mr. LeBret and other putative class members Plaintiffs lived under constant threat that their jobs and livelihoods lay in the hands of a government that from the top down, appeared antagonistic to religious objections to the vaccine. They lived in uncertainty about the status of their religious accommodation

requests because they knew from Galinis's own words, if they were not vaccinated, they "would not work for the Navy."

91) Throughout the process, the fear of not knowing how to file an exemption request, when or how the Navy would decide, and indeed whether the command would frown upon such a request, led to fear of job loss, severe anxiety, depression, and other stress-related problems that affected Mr. LeBret and other putative class members' personal and professional lives.

92) At no time were Plaintiffs' religious beliefs taken seriously or considered carefully through a process designed to protect employees' rights and balance them against the Defendants' perceived business needs.

93) There was no announcement by leadership that the Agency had a legal (and moral) obligation to protect its employees' religious liberty, nor did leadership acknowledge that religious objectors' concerns may be legitimate.

94) The Navy did eventually publish a new accommodations policy for exemptions to the vaccine and other COVID-19 related protocols, but not until February 9, 2022, months after requests for accommodations were due.

95) According to all information available to Mr. LeBret, the Navy did not distribute or share the policy with employees.

96) The policy required an interactive dialogue with the employee requesting the accommodation, which never happened. It also stated, "All requests should be processed as quickly as possible, especially given the critical timelines associated with ensuring workplace safety during the COVID-19 pandemic. Absent extenuating circumstances, all religious accommodation determinations shall be made within **45 calendar days**." (emphasis added).

97)     In sum, the Navy had no policy at all for religious accommodations at the beginning of the pandemic, and when it finally created its COVID-19 vaccine accommodations policy, it violated that policy by not engaging in any interactive process and never making a determination on putative class members' vaccine exception requests, much less doing so within 45 days.

98)     Indeed, Defendants let all vaccine exemption requests linger for a year and a half without any action or any interactive process until finally canceling the vaccine requirement after the President rescinded the mandate, effective May 12, 2023.

99)     This conduct shows a complete indifference on the part of the Defendants to the religious rights of its employees, if not outright contempt.

<u>HARASSMENT</u>

100)     Mr. LeBret and putative class members received both official and unofficial communications making clear that, by exercising their religious beliefs, they were endangering the lives of others and that DoD and the Navy desperately wanted them to comply with the vaccine mandate regardless of those beliefs.

101)     Leadership attempted to coerced Mr. LeBret and other putative class members into submitting to the vaccine by relying on the power differential between management and employees (much like in a case of sexual harassment) and using both subtle and explicit means to achieve their ends.

102)     Galinis' threatening All Hands Note of October 14, 2021, directed specifically "toward those of you who are eligible but *have not yet made the decision to get vaccinated,*" made clear he was challenging those with religious beliefs that conflicted with the vaccine to make the "right" decision and deny their faith in favor of towing the line for the government.

103)     Mr. Lebret  shared his religious beliefs about the vaccine with throughout the office with co-workers and mangers as early as August 2021, after which his direct manager called him out and shamed him for traveling with a co-worker while being unvaccinated, even before the vaccination mandate was implemented, or any travel restrictions were in place.

104)     In that instance, Mr. LeBret traveled with a co-worker to Indiana for a program meeting. Upon return, the co-worker learned that Mr. LeBret was not vaccinated and complained to Mr. LeBret's director, Mr. Hanson.

105)     Mr. Hanson chastised Mr. LeBret for "irresponsible, selfish, and dangerous" behavior that as the co-worker stated and Mr. Hanson agreed, "endangered the health and safety of [the co-worker], [the co-worker's] pregnant wife (who was not travelling to the program meeting) and their unborn child."

106)     Mr. LeBret knew that he was not at risk of spreading COVID-19 any more than the co-worker or his boss. Yet he was subject to their harassing vitriol and contempt, which was particularly devastating coming from his supervisor.

107)     Defendants also harassed and intimidated other putative class members. For example, Plaintiffs were:

- Called names such as "conspiracy theorist," "stupid," and "anti-vaxxer"
- Told there would be a "party" or "ice-cream social" that would only include employees who "made the right choice" and ignored their religious objections to the vaccine
- Made to sit far away from others, including leaders in important meetings
- Told by a co-worker they did not want to sit near anyone who did not agree to the vaccine
- Made to enduring a culture of shame, fear, ostracization and "outing"
- Singled out as "religious" and "unsafe"
- Single out as a "problem" to staff by department head
- Threatened with disciplinary action, AWOL status, or termination
- Constructively discharged

Lloyd, Lemmon, & Hale, PLLC
15 Chester St.
Front Royal, VA 22630
(540)823-1110

- Not given sick pay when they contracted COVID-19 because of religious beliefs to the vaccine – while others without such beliefs who got sick received sick-pay

108) In addition, putative class members who had religious objections to the COVID-19 vaccination and who had an exception request pending with the government were forced to submit to regular COVID-19 testing, which in many cases also violated their religious beliefs because of the invasive nature of the tests.

109) These Plaintiffs felt pressured and harassed into complying with the mandate, and many feared that raising additional objections about testing (on top of their vaccine objections) would ostracize them even more and jeopardize their jobs.

110) The Navy publicly "outed" and shamed putative class members by requiring them to pick up their testing kits and/or test in front of coworkers in obvious and embarrassing ways that broadcasted to their coworkers that they were not "compliant" with the mandate, affecting their professional reputations and ability to work as a team with their coworkers.

111) These frequent actions by leadership and co-workers shamed the employees who had religious objections to the vaccine, leaving them feeling like pariahs—unclean, less-than, demeaned, and ostracized.

112) The conduct was severe and pervasive, occurring daily and weekly over many months.

113) These official communications and many others fostered a hostile work environment, where ridicule in daily conversation pervaded the Department, sending the clear message that those with disfavored religious beliefs were unwanted and/or that their beliefs were unwanted.

Lloyd, Lemmon, & Hale, PLLC
15 Chester St.
Front Royal, VA 22630
(540)823-1110

114)     The Department sowed division in the workplace between vaccinated employees and those with religious objections to the vaccine and allowed co-workers to mock, single-out, shame, and shun Plaintiffs because they disagreed with their religious beliefs about the vaccine.

115)     While there was talk from leadership about respecting religious beliefs, the Defendants showed otherwise in their actions.

116)     The insults and harassment were pervasive and severe.

## OTHER ADVERSE ACTIONS

117)     The Department used duress, intimidation, and coercion to force Plaintiffs to give up their religious convictions and just "get the jab."

118)     Defendants' failure to use the current accommodations policy or to cobble together a new policy for filing a religious accommodation request to the vaccine was based on a total disregard for Plaintiffs' religious beliefs.

119)     To contrast, the Navy had a clear, published procedure for progressive discipline for failure to take the vaccine. Discipline included consequences such as a five-day period of "counseling and education," to 14-day suspensions without pay, to "removal from Federal service for failure to follow a direct order."

120)     Some putative class members went against their own religious beliefs and got the vaccine because they felt pressured and bullied by leadership and colleagues and did not want to risk termination.

121)     All continuously lived in uncertainty about their future. They never received a decision on their request for a vaccine exemption.

122)     They were repeatedly threatened with disciplinary action, including designation as AWOL or termination if they did not test, mask, or take the vaccine.

123) Some were constructively discharged.

124) In requiring COVID-19 testing of only employees who objected to the vaccine, the Defendants clearly treated employees with religious objections differently than others.

125) As indicated above, it was public knowledge that vaccinated employees were still at risk of contracting and transmitting COVID-19 at least as early as August and September 2021.

126) However, the Navy continued coercing all employees to get vaccines and subjecting those with religious objections to the vaccine to testing that often violated their religious beliefs and incited ostracism by coworkers, because it was made public.

127) Defendants never explained why any transmission by the vaccinated was acceptable or why testing all employees wasn't the more prudent action to ensure the safety of all.

128) Mr. LeBret and other putative class members lost the ability to travel and earn overtime, which was an essential as part of their job and a substantial amount of their pay.

129) They were "outed" when others realized they were not allowed to travel because of their religious objections to the vaccine.

130) They were required to share personal health information each time they had to affirm their vaccination status in an email or a meeting.

131) They were denied training and career opportunities and/or lost job responsibilities. They were denied the opportunity for promotion because roles required applicants to be vaccinated.

132)     Many putative class members suffered severe emotional harm, and some were forced to go on medication and/or seek physical or mental health support because of the stress and coercion from leadership and coworkers.

133)     Some putative class members were forced to resign or retire early because of the intolerable, oppressive, and hostile work environment, as well as the explicit threat of termination.

134)     Some putative class members had to take leave to deal with the stress and anxiety of the work environment and the threats of termination, as well as to look for new jobs and new homes to try to leave the Department prior to their termination.

135)     Some putative class members suffered lost pay, lost benefits, and lost retirement income when they were forced to leave the Department or be fired.

136)     Some putative class members suffered marital and family discord and separation.

137)     Some putative class members repeatedly experienced physically uncomfortable testing for COVID-19 under duress and against their religious beliefs because they felt pressured and bullied by the Department.

138)     The Department did nothing to mitigate the hostile work environment or the discriminatory acts of its leaders.

139)     In August of 2022, Mr. LeBret complained about the Mission Essential request process, the complaint was denied by the Command.

<u>MR. LEBRET'S CHARGE</u>

140)     Mr. LeBret filed a class EEO charge with the Department of the Navy on January 27, 2022, which the Department referred to the EEOC on February 22, 2023. On June 16, 2023, the EEOC issued an order of dismissal of Mr. LeBret's class complaint and remanded his

individual complaint back to the agency for review. The Department of the Navy issued its final order on July 26, 2023, dismissing Mr. LeBret's individual complaint for failure to state a claim.

141) Many putative class members in this action were a party to Mr. LeBret's EEO charge.

142) On May 12, 2023, President Biden rescinded E.O. 14043, thereby revoking the government-wide COVID-19 vaccine mandate for federal employees.

## **CLASS ACTION ALLEGATIONS**

143) Certification of a class is appropriate in this action, with PCA LeBret as the representative class agent.

144) Federal Rule of Civil Procedure 23(a) provides four criteria for courts to determine whether class certification is appropriate:

    (a) The class is so numerous that joinder of all members is impracticable;

    (b) there are questions of law or fact common to the class;

    (c) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

    (d) the representative parties will fairly and adequately protect the interests of the class.

145) Here, Complainants meet all four criteria.

## NUMEROSITY

146) To satisfy the numerosity requirement under rule 23, joinder of all parties "need not be impossible, as long as potential class members would suffer a strong litigation hardship or

inconvenience if joinder were required." *Rannis v. Recchia*, 380 F. App'x 646, 650-51 (9th Cir. 2010)(citations omitted).

147) The numerosity requirement "is not tied to any fixed numerical threshold—it requires examination of the specific facts of each case and imposes no absolute limitations. In general, courts find the numerosity requirement satisfied when a class includes at least 40 members." *Id*. (Citations omitted).

148) The putative class includes at least 115 identified members with the potential of many more. Given the nature of the mandate, and the fact that a significant portion of those who remain unvaccinated remain so because of a religious objection, the putative class is likely to be much larger than the 115 already-identified personnel, well within the numbers above courts have deemed appropriate for class certification.

149) A certified class in this case would include all NAVSEA civilian employees who requested a religious accommodation to the vaccination requirement and did not receive one. NAVSEA employs almost 87,000 employees and is predominantly staffed by civilians.

150) According to the White House, the federal workforce at large has achieved a 98% vaccination rate.

151) Assuming this statistic holds true for NAVSEA, 1,710 employees remain unvaccinated. Even if only 50% of those employees remained unvaccinated for religious reasons and decided to seek redress, the class would be over 855 employees.

152) These assumptions evidence the massive numbers of employees whose rights were violated when NAVSEA did not accommodate their religious faith.

153) Plaintiffs seek discovery to identify the full scope of the potential class in this matter.

154) The members of the class are readily ascertainable by Defendants and are sufficiently numerous that joinder of all members is impracticable.

## COMMONALITY

155) "Where the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class, commonality exists." *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1029 (9th Cir. 2012) (citations omitted).

156) "Factors to consider in determining commonality are whether the practice at issue affects the whole class or only a few employees, the degree of local autonomy or centralized administration involved, and the uniformity of the membership of the class, in terms of the likelihood that members' treatment will involve common questions of fact." *Mastren v. U.S. Postal Service*, EEOC No. 05930253 (1993).

157) Here, there are many common questions of law and fact.

158) While there may have been some degree of local autonomy, top leadership in DoD, the Department of the Navy, and NAVSEA implemented and administered the mandate, the religious accommodation process, decisions about restrictions on those who had religious objections to the vaccine, the decision not to adjudicate accommodation request, and other elements of the mandate. Defendants centrally administered the policies which applies to all putative class members uniformly.

159) All NAVEA employees who requested a religious accommodation to the vaccine mandate would have experienced the same communications from NAVSEA leadership and would have experienced the same discriminatory acts and overall hostility.

160) All putative class members filed for a religious accommodation from the vaccine.

Lloyd, Lemmon, & Hale, PLLC
15 Chester St.
Front Royal, VA 22630
(540)823-1110

161) The defendants did not grant any putative class members' claims; they were all ignored and never adjudicated.

162) All putative class members lived under threat of discipline and/or termination for failing to get the vaccine and were subject to adverse employment consequences.

163) They were all subject to restrictions because their religious beliefs prevented them from accepting the vaccine.

164) Each of the complainants are part of the protected category of Christians or other religious believers with a religious objection to the vaccine. They all have experienced the same discriminatory acts:

- Religious harassment in the form of emails that threatened termination and stigmatized those with sincerely held religious beliefs preventing the acceptance of the vaccine
- Creation of a hostile work environment where supervisors and co-workers felt free to browbeat and ostracize coworkers with disfavored religious beliefs
- Denial of travel and advancement opportunities.
- Failure to accommodate

165) The harms that they have experienced are the spiritual harms of having their employers exert sustained and persistent coercion and harassment over them to abandon a tenant of their religious faith, of experiencing religious humiliation and ridicule at the hands of their leadership and coworkers, and the psychological and emotional distress and suffering that accompanies such religious harassment.

## TYPICALITY

166) "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class. The typicality requirement looks to whether the claims of the class representatives are typical of those of the class and is satisfied

when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1019 (9th Cir. 2011)(citations omitted).

167) As indicated above, PCA LeBret's interests are aligned with the other members of the class. The events that gave rise to the harms he suffered are the same as the others in the class, as the policies that gave rise to those harms were DoD and NAVSEA-wide policies creating an approach that applied to all individuals who requested a religious accommodation to the vaccine requirement. The hostility and lack of accommodation he experienced was the same experience that others experienced throughout the shipyard.

## ADEQUACY OF REPRESENTATION

168) "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent. A class representative must be part of the class and possess the same interest and suffer the same injury as the class members. *Amchem Prods. v. Windsor*, 521 U.S. 591, 625-26 (1997) (citations omitted).

169) As the 9th Circuit has held,

> To determine whether the representative parties will adequately represent a class, the Court must examine (1) whether the named plaintiff and his counsel have any conflicts of interest with other class members; and (2) whether the named plaintiff and his counsel will prosecute the action vigorously on behalf of the class. . .
>
> Adequate representation depends upon "an absence of antagonism between representatives and absentees[] and a sharing of interest between representatives and absentees.

*Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011) (citations omitted)

170) Mr. LeBret meets these requirements. He was at all relevant times a NAVSEA employee who requested a religious accommodation that he never received. He experienced the

Lloyd, Lemmon, & Hale, PLLC
15 Chester St.
Front Royal, VA 22630
(540)823-1110

same policies, the same communication of these policies, and the same culture that other potential class members experienced. He shares the same interests as other putative class members and there is no antagonism between them (or his counsel). He has vigorously pursued this class for almost two years on behalf of himself and the putative class members at the EEOC level and with his counsel, desires to continue that representation during the next phase.[10]

## ADDITIONAL CONSIDERATIONS

171)    Rule 23 goes on in subsection (b) to require plaintiffs to identify additional justifications for class certification. Here, class certification is appropriate according to Rule 23 (b)(3).

172)    Rule 23(b)(3), requires, "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

173)    In this case, common questions of law or fact predominate over any individual inquiries.

174)    The predominate questions are whether decisions by DoD, the Navy and NAVSEA resulted in Defendants failure to accommodate Plaintiffs' religious beliefs, whether the top-down harassment by senior leadership and others created a hostile work environment or resulted in disparate treatment and whether the policies established by DoD, the Department of the Navy and NAVSEA, particularly the vaccine mandate and accompanying restrictions placed on religious believers had an adverse impact on them.

---

[10]  More information about adequacy of counsel's representation will be shared at the Motion for Class Certification stage.

175) None of the issues relies predominantly on individual assessments. Indeed, relief on behalf of one member of the putative class would necessarily apply to the entire class of individuals identified here and who have yet to be identified.

176) The substantial similarity in experience and in harm mitigates any interest of the individual class members' need to prosecute these claims. To the extent the harms differed (e.g., those who remained employed versus those who experienced constructive discharge), they fall within definable categories that are easily manageable. A class action would be the superior method by which to adjudicate their claims because of the similarities of the experience of the individual members, who all experienced the same policies and the same culture within NAVSEA.

## CAUSES OF ACTION

### COUNT I
### TITLE VII RELIGIOUS DISCRIMINATION
### FAILURE TO ACCOMMODATE

177) Plaintiffs restate the foregoing paragraphs as fully set out herein.

178) Under Title VII, a plaintiff alleging religious discrimination based on a failure to accommodate:

> Must first set forth a *prima facie* case that (1) he had a bona fide religious belief, the practice of which conflicts with an employment duty; (2) he informed his employer of the belief and conflict; and (3) the employer discharged, threatened, or otherwise subjected him to an adverse employment action because of his inability to fulfill the job requirement.

*Peterson v. Hewlett-Packard Co*., 358 F.3d 599, 606 (9th Cir. 2004) (citing *Heller v. EBB Auto. Co.*, 8 F.3d 1433, 1438 (9th Cir. 1993)). *See also*, *Keene v. City & Cty. of S.F.*, No. 22-16567 at *6, 2023 U.S. App. LEXIS 11807 (9th Cir. May 15, 2023) (unpublished).

179) The term "religion" includes:

> All aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an

Lloyd, Lemmon, & Hale, PLLC
15 Chester St.
Front Royal, VA 22630
(540)823-1110

employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business."

42 U.S.C. § 2000e(j).

180)     As the Supreme Court noted:

The intent and effect of this definition was to make it an unlawful employment practice . . . for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees.

*Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 74 (1977).

181)     A belief "can be religious even if it is not acceptable, logical, consistent, or comprehensible to others." US. v. Zimmerman, 514 F.3d 851 (9th Cir. 2007).

182)     Furthermore, the Supreme Court has made clear the deference that is required in cases of religious freedom:

Title VII does not demand mere neutrality with regard to religious practices—that they be treated no worse than other practices. Rather, it gives them favored treatment, affirmatively obligating employers not "to fail or refuse to hire or discharge any individual . . . because of such individual's" "religious observance and practice." […] when an applicant requires an accommodation as an "aspec[t] of religious . . . practice," it is no response that the subsequent "fail[ure] . . . to hire" was due to an otherwise-neutral policy. Title VII requires otherwise-neutral policies to give way to the need for an accommodation.

*EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 775, 135 S. Ct. 2028, 2034 (2015).

183)     In the recent decision of *Groff v. Dejoy*, 143 S. Ct. 2279 (2023), the Supreme Court found that "'undue hardship' is shown when a burden is substantial in the overall context of an employer's business." *Id* at 2294. It added the gloss that, "courts must apply the test in a manner that takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, 'size and operating cost of [an] employer.'" *Id* at 2295.

184) Mr. LeBret and other putative class members hold sincere religious beliefs that conflict with Defendants' COVID-19 vaccine mandate and in some cases, its testing mandate. His religious accommodation request attested to this in a thorough, sincere, and transparent manner. Other putative class members also hold similar religious beliefs that conflict with the vaccine, and all filed a similar accommodation request to the vaccine.

185) Defendants never challenged the validity of Plaintiffs' beliefs. *Keene,* 2023 U.S. App. LEXIS 11807 at *6. ("The sincerity of an employee's stated religious belief is usually not in dispute and is generally presumed or easily established").

186) Defendants were fully aware of Plaintiffs' beliefs based on Plaintiffs' accommodation requests, notwithstanding the evolving and confusing accommodations process.

187) Defendants "discharged, threatened, or otherwise subjected Mr. LeBret and other putative class members to adverse employment actions" because their faith precluded them from taking the vaccine. *Peterson*, 359 F.3d at 606.

188) Defendants repeatedly threatened Mr. LeBret and putative class members, verbally and in writing, with discipline, placement on AWOL status, and outright removal from the Navy if they failed to get vaccinated without an approved accommodation, which of course they never received.

189) Galinis stated in writing, "Frankly, if you're not vaccinated, you will not work for the Navy."

190) Several putative class members were forced to resign because of the untenable working conditions, and all were faced with the Hobson's choice the Defendants forced upon them: "lose your faith and keep your job, or keep your faith and lose your job." *See Keene v. City & Cty. of S.F.*, No. 22-16567 at *6, 2023 U.S. App. LEXIS 11807 (9th Cir. May 15, 2023)

(unpublished) (reversing and remanding Title VII claims where district court failed to consider Appellants' purported a loss of career and pressure to violate their faith in its analysis of irreparable harm).

191)     Some putative class members actually succumbed to the vaccine against their own religious beliefs just to keep their jobs.

192)     These facts alone clearly show the Mr. LeBret and other putative class members were "discharged, threatened, or otherwise subjected to adverse employment actions" because their faith precluded them from taking the vaccine. *Peterson*, 359 F.3d at 606.  *See also*, *Kerkering v. Nike, Inc*., 2023 U.S. Dist. LEXIS 133400 (D. Or., May 30, 2023) (motion to dismiss on failure to accommodate claim denied where plaintiff alleged she availed herself of the religious accommodation process to be exempt from the vaccine mandate, was denied an opportunity to discuss an alternative reasonable accommodation and under the "real threat of termination looming," plaintiff "made the choice to compromise her religious beliefs [by taking the vaccine] in order to preserve her employment").

193)     Further, Defendants avoided any interactive dialogue with Mr. LeBret and other putative class members. The legal framework for determining reasonable accommodation requires an interactive process and participation by both the employer and the employee. *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 69 (1986) (stating that, consistent with the goals expressed in the legislative history of the religious accommodation provision, "courts have noted that bilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business").

194)     The 9th Circuit has recognized "Title VII is premised on bilateral cooperation." *EEOC v. Automation United States Corp*., 52 Fed. Appx. 327 329 (9th Cir. 2023) (granting

Lloyd, Lemmon, & Hale, PLLC
15 Chester St.
Front Royal, VA 22630
(540)823-1110

defendant's motion for summary judgement where plaintiff failed to engage in religious accommodation process).

195)    "Once an employee makes [an accommodation] request, the employer is obligated by law to engage in an interactive process – a meaningful dialogue." Equal Emp. Opportunity Comm'n v. Chevron Phillips Chem. Co., 570 F.3d 606, 621 (5th Cir. 2009).

196)    Defendants neither requested nor proposed that Mr. LeBret or other putative class members participate in any discussion to find a fair and legal accommodation for their religious beliefs. They did not seek additional information, ask questions, or engage in any bilateral discussion to address, much less to accommodate, preserve, or honor Plaintiffs' sincere religious beliefs. To the contrary, Defendants appeared to subvert Plaintiffs' accommodations requests in favor of promoting as many vaccines as possible for as many employees as possible.

197)    Defendants' undue delay in responding to Plaintiffs' request was also unlawful. In the context of a Title VII religious discrimination claim, "'a week-to-week, wait-and-see posture' amounts to no accommodation at all." EEOC v. Robert Bosch Corp., 169 F. App'x 942, 945 (6th Cir. 2006) (citing EEOC v. Arlington Transit Mix, Inc., 957 F.2d 219, 222 (6th Cir. 1991)).

198)    In this case, Defendants specifically ordered leaders NOT to take any action on accommodations requests, notwithstanding that Defendants were sending coercive communications highlighting the impending vaccination deadline, with no process in place for Plaintiffs to defend their beliefs.

199)    Courts have held that both delay and denial of religious accommodation are deemed an "injury" in and of themselves. See e.g., Doster v. Kendall, No. 1:22-cv-84, 2022 U.S. Dist. LEXIS 125400, at *10-13 (S.D. Ohio July 14, 2022) (in the context of a Religious Freedom Restoration Act / First Amendment case).

200)   Defendants evaded any sort of "bilateral cooperation" with Mr. LeBret and other putative class members and in doing so caused anguish for Plaintiffs who lived for over a year and half under the threat that they would be terminated if their accommodations were not granted.

201)   Defendants failed to adjudicate any vaccine accommodations. Rather, Defendants made Mr. LeBret and other putative class members linger in a no-man's land of fear and coercion, knowing that the government held their livelihoods in its hands.

### COUNT II
### TITLE VII RELIGIOUS DISCRIMINATION
### HARASSMENT/ HOSTILE WORK ENVIRONMENT

202)   Plaintiffs restate the foregoing paragraphs as set forth fully herein.

203)   As the Supreme Court noted in *Harris v. Forklift*, 510 U.S. 17, 21 (1993), the language of Title VII "evinces a congressional intent to strike the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatory hostile or abusive environment," (*citing Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57 at 64 (1986)). The injuries are "not limited to 'economic' or 'tangible' discrimination." *Id.*

204)   "When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Id.*

205)   To succeed on a hostile work environment claim, the plaintiff must demonstrate: "(1) that he was subjected to verbal or physical conduct of a [based on his protected class]; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to

alter the conditions of the plaintiff's employment and create an abusive work environment."

*Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003).

206)    To determine whether conduct is severe and pervasive, the court looks at the context of the alleged harassment to determine its frequency and severity, whether it is physically threatening or humiliating, and the extent to which it unreasonably interferes with the employee's work performance. *Id.*

207)    The working atmosphere must be both subjectively and objectively abusive. *Id.*

208)    In the instant case, religious believers have suffered months and even years of continuous intimidation, ridicule, and insult because of their religious beliefs.

209)    First, Vice Admiral Galinis' memo directed specifically to those who had yet to "make a decision" about whether to forsake their deeply held religious beliefs, could only be read as antagonistic to religious believers.  Mr. LeBret and other religious believers who read that email knew immediately that their jobs were in jeopardy if they did not take the vaccine.

210)    In the heavy-handed memo itself, Galinis entirely ignored Plaintiffs' religious beliefs (as did all Defendants after Plaintiffs filed their requests for accommodation).  Yet, Galinis and other Defendants had a duty not just to consider Plaintiffs' religious practices with "neutrality," or treat them "no worse than other practices." *Abercrombie & Fitch Stores, Inc.*, 575 U.S. at 775.  He and other Defendants had an affirmative duty to give Plaintiffs' religious beliefs "favored treatment." *Id.*  Indeed, "Title VII requires otherwise-neutral policies to give way to the need for an accommodation.

211)    And while Galinis' memo was not "physically threatening" to Plaintiffs, it was as much of a sucker punch as if they had been hit in the gut.  He stated unequivocally and without a

Lloyd, Lemmon, & Hale, PLLC
15 Chester St.
Front Royal, VA 22630
(540)823-1110

hint of grace, that their jobs were on the line if they did not take the vaccine, which they knew they could not.

212)     Because of their religious objections to the vaccine mandate, putative class members were also treated as pariahs, disease-carriers, and disease-spreaders, regardless of whether they actually had COVID-19 at any given time or had contracted the disease in the past and therefore had natural immunity.

213)     Mr. LeBret was harassed by his own manager, who upon information and belief was well aware of Mr. LeBret's religious reasons for not being vaccinated, and said Mr. LeBret was being "irresponsible, selfish and dangerous," merely for traveling with a co-worker on a work trip.  Mr. LeBret and other putative class members were subject to hateful and demeaning comments such as, "stupid", "conspiracy theorist", and "anti-vaxer."  They were isolated from others, prevented from traveling or even going into work, ridiculed as not worthy of an "ice-cream social," and singled out as "religious" and "unsafe."

214)     They suffered through "outing" experiences such as masking, testing, and forced absence from office-wide work gatherings.

215)     The testing itself was physically invasive and uncomfortable, while at the same time scientifically unjustified.

216)     They were forced to use a different and invasive procedure for acquiring religious accommodation, and never received an accommodation at all.

217)     Many lost opportunities for travel, temporary assignments, and opportunities at career advancement because of their religious beliefs.

218)     Defendants fostered a pervasive environment of religious discrimination and harassment in violation of Title VII of the Civil Rights Act.

## COUNT III
## TITLE VII RELIGIOUS DISCRIMINATION
## RETALIATORY HARASSMENT

219)     Even if Mr. LeBet's and other putative class members' cases are deemed not sufficiently severe or pervasive to trigger a harassment claim under Title VII, they are sufficient to raise a claim of Retaliatory Harassment under Title VII.

220)     As explained in the EEO's decision stemming from the Navy's Puget Sound Naval Shipyard and Intermediate Maintenance Facility in Yokasuka, Japan:

> The threshold for establishing retaliatory harassment is different than for discriminatory hostile work environment. Retaliatory harassing conduct can be challenged under the *Burlington Northern* standard even if it is not severe or pervasive enough to alter the terms and conditions of employment. EEOC Enforcement Guidance on Retaliation and Related Issues, No. 915.004, Sect. II.B, ex. 17. (Aug 25, 2016) (*citing Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006).

*Merlin W., Complainant v. Carlos Del Toro, Secretary of the Navy*, Appeal No. 20220002711, Agency Number 19-4523A-00428, Sept 22, 2021 (pending final publication).

221)     Although petty slights and trivial annoyances are not actionable, adverse actions such as reprimands, threats, negative evaluations, and harassment are actionable. *Id.* at 8.

222)     To prevail in a retaliatory harassment claim, a complainant must show that a reasonable person would have found the challenged action materially adverse, i.e., an action that might well have dissuaded a reasonable worker from making or supporting a charge of discrimination in the future. *Id.* at 53 (*citing Burlington Northern*).

223)     Mr. LeBret and putative class members belong to a statutorily protected class based on their protected EEO activity of requesting a religious accommodation and were subjected to unwelcome verbal and written conduct.

224) They were subjected to retaliatory harassment when Defendants threatened them with disciplinary action, placement on AWOL status, and removal from Federal service for failing to take the vaccines. Defendants forced many of them to resign, limited their ability to perform their jobs, denied travel, and other adverse actions.

225) These actions individually and in totality are materially adverse and would deter a reasonable person from engaging in protected EEO activity.

## COUNT IV
## RELIGIOUS FREEDOM RESTORATION ACT

226) The Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C.S. § 2000bb et seq., sets the standards binding the United States government and its officials to recognize and accommodate sincerely held religious beliefs, including in the military context. *U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336, (5th Cir., 2022).

227) As the Supreme Court has noted, RFRA affords even "greater protection for religious exercise than is available under the First Amendment[]" and provides that the "Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Navy Seals*, 27 F.4th 347-358, 350, citing *Holt v. Hobbs*, 574 U.S. 352, 357, 135 S. Ct. 853, 859-60, 190 L. Ed. 2d 747 (2015); 42 U.S.C. § 2000bb-1.

228) "A government action or regulation creates a 'substantial burden' on a religious exercise if it truly pressures the adherent to significantly modify his religious behavior and significantly violates his religious beliefs." *Id.* at 350, *citing Adkins v. Kaspar*, 393 F.3d 559, 570 (5th Cir. 2004) (involving RLUIPA).

229) Here Defendants have substantially burdened the exercise of religion by forcing religious believers to either take the vaccine or be subject to a true parade of horribles, including removal from service.

230) In burdening putative class members' religious beliefs, Defendants did not use the "least restrictive means" possible, as other approaches were available and indeed previously utilized (i.e., remote work). Nor did Defendants burden Plaintiffs' beliefs in pursuit of legitimate government ends, as vaccination did not prevent the transmission of the disease.

231) As the 5th Circuit found in *Navy Seals v. Biden*, the vaccine would "directly burden [Plaintiffs'] respective faiths by forcing them to inject an unremovable substance at odds with their most profound convictions. This injury would outlast their military service, making the decision whether to acquiesce far more difficult than just choosing between 'their job(s) and their jab(s).' *Navy Seals*, 27 F4th at 350 (*quoting, BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021).

232) The "vaccine requirements principally compete against [Plaintiffs] faiths and secondarily against their livelihoods. . . These circumstances impose a substantial burden on Plaintiffs." *Id.* at 350. The Navy's actions in this case unjustly burden Plaintiffs' religious beliefs just as they did in Navy Seals.

233) The 9th Circuit has found that RFRA does not waive sovereign immunity with respect to claims against the federal government for monetary damages. *Donovan v. Vance*, 70 F.4th 1167, 1172 (9th Cir. 2023).

234) The Supreme Court, however, has found that RFRA allows plaintiffs to recover monetary damages against federal officials in their individual capacities. *Tanzin v. Tanvir*, 141 S. Ct. 486 (2020).

235) Accordingly, Plaintiffs bring this RFRA claim against Defendants Lloyd J. Austin, III, Gilbert R. Cisneros, Jr., Carlos Del Toro, and William Galinis, in their individual capacities, and only in their individual capacities.

236) This RFRA claim is the only claim that Plaintiffs and other putative class members bring against any defendant in his individual capacity.

## PRAYER FOR RELIEF

237) Plaintiffs respectfully request that the Court award:

(a) Compensatory damages for monetary and non-monetary loss;

(b) Exemplary and punitive damages;

(c) Prejudgment interest;

(d) Reasonable attorney's fees; and,

(e) Such other relief as law or equity may pertain.

## JURY TRIAL

A jury trial is requested in this matter.

Dated: October 24, 2023                    Respectfully Submitted,


/s/ E. Scott Lloyd
E. Scott Lloyd
Virginia Bar # 76989
Lloyd, Lemmon, & Hale, PLLC
15 Chester Street
Front Royal, VA 22630
(540) 823-1110
(540) 631-4081
scott@lloydlemmonhale.com
Lead Attorney
* *pro hac vice admission pending*

**SILENT MAJORITY FOUNDATION**

*/s/Simon Peter Serrano*
Simon Peter Serrano, WSBA No. 54769
5238 Outlet Dr.
Pasco, WA 99301
(530) 906-9666
pete@silentmajorityfoundation.org

*/s/Karen L. Osborne*
Karen Osborne, WSBA No. 51433
KOSBORNE LAW, LLC
9721 NE Livingston Mountain Court
Camas, WA 98607
(360) 975-3813
karen@smfjb.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I will cause the foregoing to be served upon the Department on October 24, 2023.


/s/ E. Scott Lloyd

SCOTT LLOYD

Lloyd, Lemmon, & Hale, PLLC
15 Chester St.
Front Royal, VA 22630
(540)823-1110